UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re:<br><br>LINDSEY CAMPBELL and<br>WILLIAM A. CAMPBELL,<br><br>Debtors | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Chapter 7<br>Case No. 23-40688-CJP |
| LAWRENCE BUCCI and<br>PAMELA BUCCI<br><br>Plaintiffs<br><br>v.<br><br>LINDSEY CAMPBELL AND<br>WILLIAM A. CAMPBELL,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | AP No. 24-4013-CJP |

**MEMORANDUM OF DECISION**

The plaintiffs Lawrence Bucci and Pamela Bucci (the "Buccis" or "Plaintiffs") have brought this adversary proceeding against the debtor-defendants Lindsey Campbell and William Campbell (the "Campbells" or "Debtors") objecting to the dischargeability of debt owed to the Plaintiffs and to the Debtors' discharge. This adversary proceeding is another chapter in a long-standing dispute between the parties arising from the sale of real estate to the Plaintiffs in a subdivision developed by the Campbells that resulted in a substantial state court judgment in favor of the Plaintiffs that the Debtors seek to discharge through their bankruptcy case. While the Debtors filed their case under chapter 7, they subsequently moved to convert their case to chapter 13 [Case No. 23-40688 ("Main Case") ECF No. 119] (the "Motion"). As will be

discussed in detail, the Plaintiffs assert that the Campbells should be denied a discharge because of bad acts committed in connection with this bankruptcy case pursuant to 11 U.S.C. § 727[1] and should not be permitted to convert their case to a case under chapter 13 because of those same acts.

Because the parties disagreed on whether a finding of lack of good faith could be a basis to deny conversion, I directed briefing with respect to that issue and entered an initial order on the Motion [Main Case ECF No. 177] determining that discrete question in the bankruptcy case. Based *Marrama v. Citizens Bank of Mass. (In re Marrama) (Marrama II)*, 549 U.S. 365 (2007), where the Supreme Court concluded that a debtor who has acted in bad faith does not have an absolute right to convert a chapter 7 case to a case under chapter 13 because "[n]othing in the text of either § 706 or § 1307(c) (or the legislative history of either provision) limits the authority of the court to take appropriate action in response to fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to the relief available to the typical debtor," *id.* at 374–75, and that the Bankruptcy Code "authorize[s] immediate denial of a motion to convert filed under § 706 in lieu of a conversion order that merely postpones the allowance of equivalent relief and may provide a debtor with an opportunity to take action prejudicial to creditors," *id.* at 375, I held that the "alleged bad faith conduct of the Debtors must be examined in determining the Motion and whether conversion is appropriate or would result in reconversion to chapter 7 for 'cause.'" *Order on Motion to Convert Case to Chapter 13 and Case Management Conference Scheduling Order* [Main Case ECF No. 177], at 2.

I then consolidated for trial the Motion, with respect to which the Debtors' good faith in seeking to convert to chapter 13 is at issue, and Counts I–IV of the complaint (the "727

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code" or "Code").

2

Counts"), pursuant to which the Plaintiffs allege certain acts and omissions of the Debtors related to their schedules and statement of financial affairs, as well as in their testimony at the section 341 meeting of creditors, and a failure to satisfactorily explain loss of assets justify denial of the Debtors' discharge under § 727(a)(2), (4)(A), and (a)(5).[2] At trial, six witnesses testified in person and/or submitted trial affidavits, and twenty-three exhibits were admitted into evidence. For the reasons discussed below, I will enter an order denying the Motion and enter judgment in favor of the Buccis on the 727 Counts denying the Campbells' discharge.[3] I have made findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 that are incorporated throughout the discussion in this decision.[4]

## I. THE 727 COUNTS

### a. Legal Standards to Be Applied

Counts I, III, and IV assert that the Campbells should be denied a discharge because, at various times in this case, the Campbells knowingly and fraudulently made false statements under oath in connection with this case, § 727(a)(4), and concealed assets, § 727(a)(2)(A).

---

[2] Section 727(a)(2) is not referenced in body of complaint but is referenced at the conclusion of the complaint. The parties identified as an issue of law remaining to be determined as whether "the discharge of the Debtors [should be barred under 11 USC 727(a)(2)(3)." Joint Pre Trial Memorandum [ECF No. 30], at 15. In their post-trial brief, the Debtors acknowledged the complaint sought to deny the Debtors' "discharge pursuant to §§727(a)(2), (a)(3),(a)(4), (a)(5) and 523(a)(2)(A)." See Post-Trial Brief [ECF No. 59], at 1.

[3] The Court stayed determination of Count V of the complaint concerning dischargeability of a debt under § 523(a)(2) pending resolution of the 727 Counts. See Order [ECF No. 16].

[4] Any findings of fact that are, in whole or part, rulings of law shall be considered as such and vice versa. While I may cite to specific supporting evidence in the record, my findings are often supported by additional evidence in the record I have considered, and I do not intend to limit support for my findings to the cited portion of the record. Further, to the extent that I reference testimony or other evidence that supports my rulings, I have credited that testimony or other evidence even if I have not expressly stated that. Where I have referenced testimony or other evidence that does not support my rulings, I have weighed that evidence, but it has not overcome the weight that I have given to other evidence in the record, whether explicitly referenced or not. The weight that I have given to testimonial evidence reflects my assessment of the credibility of the witness and consistency of the testimony with other evidence. I also have adopted and incorporated certain portions of post-trial briefing in my findings.

>It is well settled in the First Circuit that to prevail on a claim under § 727(a)(4), the plaintiff must prove that: (1) the debtor knowingly and fraudulently made a false oath; and (2) the false oath related to a material fact. . . . The "burden of proof rests with the [plaintiff], . . . but 'once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged.'"

*Robin Singh Educ. Serv., Inc. v. McCarthy (In re McCarthy)*, 488 B.R. 814, 825–26 (B.A.P. 1st Cir. 2013) (internal citations omitted) (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 100 (1st Cir. 1987)).  The intent required by § 727(a)(4)(A) may be satisfied by a showing of reckless disregard for the truth.  *See id.*, 488 B.R. at 826; *see also In re Tully,* 818 F.2d at 112 (acknowledging that "reckless indifference to the truth" has "consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)").  "Even though courts will not construe an ignorant or inadvertent omission as evidence of fraudulent intent, reckless disregard may nonetheless be found based on the 'cumulative effect of a series of innocent mistakes.'" *In re McCarthy*, 488 B.R. at 826 (quoting *Discenza v. MacDonald (In re MacDonald),* 50 B.R. 255, 259 (Bankr. D. Mass. 1985)).  "Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *In re Tully*, 818 F.2d at 110.

"The subject matter of a false oath is material, and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property." *Nickless v. Fontaine (In re Fontaine)*, 467 B.R. 267, 272 (Bankr. D. Mass. 2012) (internal quotation omitted).  The First Circuit Bankruptcy Appellate Panel explained:

>Few, if any, assets are more material to a consumer debtor's financial affairs than a bank account, for it is from that kind of asset that the creditors can discern not only an overall picture of the debtor's financial affairs, but also the detail of the debtor's finances. In addition, a debtor cannot claim that he omitted an asset because it had little or no value. Debtors have an absolute duty to report all assets

4

> even if they believe their assets are worthless or are unavailable to the bankruptcy estate.

*In re McCarthy*, 488 B.R. at 827–28 (internal citations and quotations omitted).

A debtor's discharge may also be denied where a debtor has transferred or concealed assets. Section 727(a)(2)(A) prohibits entry of a debtor's discharge if, "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Code]," the debtor "has transferred, removed, . . . or concealed, or has permitted to be transferred, removed, . . . or concealed . . . property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A). A § 727(a)(2)(A) claim has four elements: "(1) transfer or concealment of property (2) that belonged to the debtor (3) less than a year before the petition date (4) with actual intent to hinder, delay, or defraud a creditor or the trustee. *Marrama v. Citizens Bank of Mass. (In re Marrama)*, 445 F.3d 518, 522 (1st Cir. 2006) (citation omitted). The first, second, and third elements are further described as follows:

> "Transfer" means "each mode . . . of disposing of or parting with . . . property or an interest in property." 11 U.S.C. § 101(54)(D). Under this definition, "any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title." [*In re Watman*, 301 F.3d 3, 10 (1st Cir. 2002)] (citation omitted). "Concealment" can take various forms. These include (i) the debtor's withholding of information about an asset in which he or she has an interest and that he or she is duty-bound to reveal and (ii) the debtor's ostensible transfer of title to an asset coupled with his or her secret retention of the benefits of ownership. *R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes)*, 229 B.R. 253, 259 (B.A.P. 1st Cir. 1999) . . .. Further, under the doctrine of "continuing concealment," § 727(a)(2)(A) can bar a debtor's discharge even if the original transfer or concealment occurred more than a year before the petition date "if it is established that the debtor continued to conceal that interest from creditors during the year prior to the petition filing." *Investors Grp., Inc. v. Annunziata (In re Annunziata)*, 2008 WL 410643, at *5–6 (Bankr. D. Mass. Feb. 12, 2008) (citation omitted) . . .. "[A] relevant concealment can occur only if *property of the debtor* is concealed . . . . the debtor must possess some property interest [in order] to be barred from discharge on the grounds of 'continuing concealment.' [. . .] This doctrine does not negate the 'act' requirement of § 727 but merely recognizes that a failure to reveal property previously concealed can,

5

in some circumstances, properly be considered culpable conduct during the year before the bankruptcy warranting a denial of discharge." *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3rd Cir. 1993). The Bankruptcy Appellate Panel has cautioned: "Section 727(a)(2)(A) plaintiffs must prove that the requisite conduct, accompanied by the requisite intent, actually took place within the year preceding the bankruptcy." *Hayes*, 229 B.R. at 260.

*Irish Bank Resolution Corp. Ltd. v. Drumm (In re Drumm)*, 524 B.R. 329, 404 (Bankr. D. Mass. 2015) , *aff'd*, No. 15-CV-10184-LTS, 2015 WL 9911447 (D. Mass. Nov. 20, 2015) (internal citations omitted).  The fourth element of intent includes the following considerations:

> Because it is phrased disjunctively, the intent prong of § 727(a)(2) is satisfied by an intent to hinder, or an intent to delay, or an intent to defraud. . . . Direct evidence of intent is not required. [*In re Marrama*], 445 F.3d at 522. Instead, intent can be established by one or more badges of fraud, including: (1) insider relationships; (2) the debtor's continued possession, benefit, or use of transferred property; (3) a lack of consideration; (4) the debtor's financial condition; (5) a pattern or series of transactions or course of conduct after the onset of debt, financial difficulties, or litigation (actual or threatened); (6) the general chronology of events; and (7) an attempt to keep transactions a secret. *Id*. . . .. The accumulation of several badges "indicates strongly that a debtor possessed the requisite improper intent." *Annino, Draper & Moore, P.C. v. Lang (In re Lang)*, 246 B.R. 463, 469 (Bankr. D. Mass. 2000), *aff'd*, 256 B.R. 539 (B.A.P. 1st Cir. 2000) . . . . Further, a debtor's reckless disregard of his financial obligations, *Cox v. Villani (In re Villani)*, 478 B.R. 51, 61 (B.A.P. 1st Cir. 2012), and failure to properly disclose a transfer, *id*. at 60, are both probative of fraudulent intent. In addition, where, as here, the debtor is financially sophisticated, it is less likely that a transfer or concealment is innocent in nature. *See JP Morgan Chase Bank v. Koss (In re Koss)*, 403 B.R. 191, 213 (Bankr. D. Mass. 2009). And in assessing intent, a court should consider the debtor's "'whole pattern of conduct.'" *Lassonde v. Stanton (In re Stanton)*, 2010 WL 757804, at *14 (Bankr. D.N.H. Feb. 8, 2010) (citation omitted); *Villani*, 478 B.R. at 60 (weighing all of the debtor's transfers and concealments together to find intent).

*Id.* at 404–05 (internal citations omitted).

Count II asserts that the Campbells should be denied a discharge because they are unable to satisfactorily explain the loss of assets consisting of bond release payments made to them. Section 727(a)(5) provides that "the court shall grant the debtor a discharge, unless . . . the debtor

6

has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). "Section 727(a)(5) is broadly drawn and gives the bankruptcy court broad power to decline to grant a discharge in bankruptcy when the debtor does not adequately explain a shortage, loss, or disappearance of assets." *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803, 817 (B.A.P. 1st Cir. 2005) (citations omitted). "Under § 727(a)(5), a plaintiff must establish: (1) that the debtors have experienced a loss of assets or deficiency of assets; and (2) that the debtors cannot provide a satisfactory explanation for such loss." *Id.* (citing 6 *Collier on Bankruptcy* ¶ 727.08 (Lawrence P. King ed., 15th ed. rev. 2002)). The plaintiff must produce some evidence that the debtor no longer has assets which he previously owned; then a debtor has the burden of providing a satisfactory explanation for the loss or deficiency of the asset. *See id.*

> As stated by the Bankruptcy Appellate Panel in *Aoki*:
>
> What constitutes a "satisfactory" explanation for § 727(a)(5) purposes is left to the discretion of the court. *See Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir. 1966). In determining whether to grant a discharge under § 727(a)(5), a court is interested in what happened to a debtor's assets and not in the wisdom of the debtor's disposition of the assets. *See id.* Moreover, unlike § 727(a)(2)(A), there is no requirement under § 727(a)(5) that a debtor act fraudulently or intentionally. []
>
> A debtor's explanation need not be comprehensive, but it must meet two criteria: First, it must be supported by at least some corroboration. . . . Second, the corroboration must be sufficient to eliminate the need for any speculation as to what happened to all of the assets. . . . A debtor's explanation must consist of more than "a vague or indefinite references, evidence or explanations, or an uncorroborated hodgepodge of financial transactions." . . . "A jumble of vague, unassorted memoranda, checks, bank statements, and bills" is insufficient. . . . Therefore, discharge will be denied when a debtor makes only a vague evidentiary showing that the missing assets involved have been used to pay unspecified creditors, or where the debtor fails to provide corroborative documentary evidence to confirm his explanation.

*In re Aoki*, 323 B.R. at 817–18 (internal citations omitted).

7

### b. *Findings Relevant to the 727 Counts*

The Campbells filed their petition for relief on August 24, 2023, and executed and filed schedules and a Statement of Financial Affairs (collectively, the "Schedules") under penalty of perjury at that time. Ex. 1.[5] The Campbells admit that certain statements made on the Schedules were not accurate and contained omissions. *See* Joint Pre Trial Mem. (stipulated facts); Affidavit of Lindsey Campbell [ECF No. 51] ("LC Affidavit"), ¶ 47; Affidavit of William Campbell [ECF No. 50] ("WC Affidavit"), ¶ 20. For example, the Campbells failed to disclose jewelry, pets, a Venmo account, and various home furnishings and equipment. The Campbells also misstated certain expenses, income, account balances, and liens. They failed to disclose an executory contract for the installation of solar panels. Each Debtor states in their trial affidavit that "I did not carefully review the documents before I signed them." LC Aff., ¶ 52; WC Aff., ¶ 21; *see also* LC Aff., ¶ 48. Taken alone, any of these admitted false statements might be explained as inadvertence or lack of understanding that information provided to their attorney in an earlier questionnaire needed to be updated before filing, as proffered by the Campbells, but I must view the explanations in the context of a substantial number of other false statements and omissions demonstrated by the evidence in this Adversary Proceeding.

### i. The 2022 Tax Refund

Lindsey Campbell prepared tax returns for the Debtors using Turbo Tax software for tax years 2021, 2022, and 2023. *See* Ex. 3. For tax years 2021 and 2023, the year before and the year after the bankruptcy filing, Ms. Campbell selected direct deposit to the Campbells' bank account at Hanscom Federal Credit Union ("Hanscom") (account ending 8120) for delivery of refunds. *Id.* at 11, 72, 85. For tax year 2022, Ms. Campbell elected to have her federal and state

---

[5] Unless otherwise stated, any reference to an exhibit is to an admitted trial exhibit.

8

tax refunds mailed to her. *Id*. at 33, 46. She would have made that election at the time she prepared the 2022 returns, after January 2023. The federal and state tax refund checks for tax year 2022 were issued on May 5, 2023 and April 24, 2023, respectively, for $5,101.00 and $560.00. Ex. 15, at 328–29. The Campbells did not deposit the refund checks into their Hanscom bank account until November 8, 2023, several months after filing for bankruptcy. *Id*. at 346.

The Campbells did not list any tax refunds as owed to them or disclose that they were in possession of uncashed checks in the Schedules. *See* Ex. 1, at 14–15 (Schedule A/B, questions 28, 35, and 53). The Campbells filed an amended Schedule A/B on January 11, 2024, but did not disclose the tax refunds or tax refund checks for tax year 2022. *See* Ex. 2 (the "Amended Schedules"), at 7–8. The Campbells did not offer any specific credible explanation at trial addressing the tax refunds, the delay in depositing the refund checks, or the failure to disclose the refund checks. The evidence, with reasonable inferences therefrom, demonstrates that the Campbells knowingly and fraudulently omitted this asset from the Schedules or did so with reckless indifference and acted with intent to conceal the tax refund checks that I find were in their possession at the time of filing.

      ii. <u>The Bank Check and Solar Panel Installation</u>

On July 14, 2023, the Campbells obtained an official check from Hanscom in the amount of $21,278.00. The check was made payable to Tesla and the reference on the check stated, "SOLAR PANELS." Ex. 15, at 331. On or about August 1, 2023, approximately three weeks before filing for bankruptcy relief, Ms. Campbell executed a contract with Tesla for the installation of solar panels on the Campbells' home. Ex. 9, at 4. The total amount of the contract was $21,528.00. *Id*. at 3. The Campbells paid a deposit of $250.00, leaving a balance

9

due of $21,278.00. William Campbell testified that he kept the check in his truck until it was delivered to Tesla in November of 2023. The check was cashed by Tesla on November 28, 2023. Ex. 15, at 331.

The Campbells did not identify any executory contracts in the Schedules. Ex. 1, at 26 (Schedule G). The Campbells did not amend Schedule G. *See* Ex. 2; Affidavit of Gary M. Weiner, Chapter 7 Trustee (the "Trustee") [ECF No. 45] (the "Weiner Affidavit"), ¶ 19. But they did disclose the transaction in their Schedules. Ex. 1, at 36 (response to Statement of Financial Affairs, question 18). In response to Plaintiffs' allegations that the Campbells failed to disclose the solar panel contract, the Campbells claimed that they did not understand the meaning of "executory contract" and did not intend to hide the transaction evidenced by the fact that they listed the solar panel transaction elsewhere. *See* LC Aff., ¶ 57; WC Aff., ¶ 26.

During a Section 341 creditors meeting conducted by the Trustee on September 27, 2023, the Campbells did not disclose that they had a check in their possession for the purchase of solar panels. Weiner Aff., ¶ 16. During that meeting, Trustee Weiner cautioned the Campbells against continuing to use their home equity line of credit (HELOC) account. *Id*. at ¶ 14. It was only during the continued meeting on October 31, 2023, after being questioned about the solar panel issue, that Mr. Campbell testified he had the check for $21,278.00 of HELOC funds in his possession. *Id*. at ¶ 15.

Under the Tesla solar panel contract, the Campbells had the ability to cancel the contract. The contract contained the following provision:

> Cancellation. At any point prior to the time when we deliver materials to your home in preparation for your installation, either of us can cancel your order for any reason provided that we let the other know in writing (so there is no misunderstanding). If we are responsible for canceling your order, we will return any deposits and upfront fees you have paid. If you cancel or cause us to cancel your order, your deposit and upfront fees are non-refundable.

10

Ex. 9, at 1.

I draw the inference that the Campbells desired to have solar panels installed on their home and took steps prior to filing their bankruptcy case to access their HELOC funds so that their access to those funds would not be impaired by the filing. The Campbells also claimed a homestead exemption of $500,000 in their home. Ex. 1, at 17 (Schedule C). They asserted that the value of their home was $1.115 million and that it was encumbered by approximately $600,000 of first and second (the HELOC) mortgage debt. *Id.* at 17, 19–20. The value of the home has been disputed by the Plaintiffs. I infer that the Campbells saw it as advantageous to have a higher HELOC balance, both in connection with any possible dispute of whether there was equity in the home beyond their claimed exemption and to ensure availability of the Tesla payment to be made after the bankruptcy petition for installation of the solar panels. The evidence, with reasonable inferences therefrom, demonstrates that the Campbells knowingly and fraudulently failed to disclose that they were in possession of the undelivered Tesla check in the Schedules or did so with reckless indifference and acted with intent to conceal the undelivered check and the fact that the Tesla transaction had not been consummated from the Trustee and creditors. While it is unclear what benefit the Campbells ultimately derived from their efforts, and they certainly remain obligated for the funds secured by the second mortgage, I find that the Campbells intentionally acted to ensure that the solar panel transaction was completed notwithstanding the intervening bankruptcy filing.

      iii. <u>Transfers to Ms. Campbell's Mother</u>

On March 20, 2023, the same day that the Campbells obtained their Certificate of Credit Counseling to file this bankruptcy case, Ms. Campbell transferred $4,000.00 from her Hanscom account to the Hanscom account belonging to her mother, Marie Hartwell ("Ms. Hartwell") with

11

the notation "2 kids." Ex. 15, at 71. Ms. Campbell alleged that the purpose of the transaction was an agreement to compensate Ms. Hartwell for childcare for the remainder of 2023 so that Ms. Campbell could go back to work part time. *See* LC Aff., ¶ 66. Ms. Campbell had already been working part time since July 2022. *See* Ex. 4, at 1–28. On redirect, Ms. Campbell testified that the timing of the $4,000.00 payment was to coincide with when Mr. Campbell went back to work, but the evidence shows that Mr. Campbell began full time employment in September 2022, which continued until January 2024. *See id.* at 61–96; January 23, 2025, Trial Day 2 ("Trial Day 2"), William Campbell Test., at 10:04:57-10:05:31.[6] Ms. Hartwell testified that there was no agreement that she be paid to provide childcare for her grandchildren and that she stated that no payment was necessary. Ms. Campbell testified that her mother incurred expenses in feeding the children and saved the family substantial amounts of money by providing childcare. The same day that Ms. Hartwell received the $4,000, Ms. Hartwell made four $1,000 transfers to the Campbells' children with alternating notations of "From Mom" and "From Dad." Ex. 22, at 16; *see also* Ex. 23, at 14, 34, 53, and 74. I do not find that the Campbells intended the transfer to be gifts to their children (I accept that the deposits to the children's accounts were the acts of a generous grandmother), but note that the $4000 transfer to Ms. Hartwell was not disclosed in the Schedules as a gift, payment to an insider, or as a transfer outside the ordinary course of the affairs of the family. Ex. 1, at 34–36 (responses to Statement of Financial Affairs, questions 7, 8, 13 and 18).

Earlier, in July of 2021, the Campbells had made a much more substantial transfer to Ms. Hartwell. That month, the Town of Westford issued a $43,008.46 bond refund check to Ms. Campbell relating to development of the subdivision. Ex. 15, at 330. Ms. Campbell deposited

---

[6] There is no written trial transcript, and the time references are from the audio recording of the trial.

the bond refund check into Ms. Hartwell's account on August 17, 2021. Ex. 22, at 4–6. On August 21, 2021, Ms. Hartwell transferred $7,500.00 to each of the Campbell children and then transferred back to Ms. Campbell $13,008.46 with the notation "town back." *Id*. The sum of the five transfers was $43,008.46, the exact amount as the bond refund check. Ms. Campbell was confronted with testimony that she had given during a Rule 2004 examination where she testified that she did not know where the funds went but believed that they were deposited into her 8120 account at Hanscom, not any other account. *See* January 22, 2025, Trial Day 1 ("Trial Day 1"), Lindsey Campbell Test., at 12:02:22-12:04:23. The accounts to which Ms. Hartwell transferred the funds were not established until August 2021, a month after the bond refund was issued. *See* Ex. 23, at 1–5, 24, 44, and 62.

In her trial affidavit and in her trial testimony, Ms. Campbell stated that the Campbells had borrowed money from her mother and from their children's accounts. Although she could not remember how much she borrowed from either her children or her mother and had no loan documentation, Ms. Campbell testified that she believed she owed her mother $40,000.00 to $50,000.00. That testimony was directly contradicted by Ms. Hartwell. Ms. Hartwell testified that she was not owed money and that the funds were not for her personally. *See* Trial Day 1, Marie Hartwell Test., at 15:28:12-15:29:39.

The Campbells have characterized the $43,008.46 transfer as a repayment of debt to Ms. Hartwell or their children outside one year that did not require disclosure. They have offered no evidence other than their testimony, which I do not credit, and that was directly contradicted by other evidence that they did not owe Ms. Hartwell $40,000.00 to $50,000.00. Ms. Campbell also alluded to repayment of "borrowings" from their children's accounts, but introduced no documentary evidence supporting that testimony, which I do not credit. The $43,008.46 transfer

13

to Ms. Hartwell was not disclosed in the Schedules as a gift or as a transfer outside the ordinary course of the affairs of the family because it was made just days outside two years of the bankruptcy filing. Ex. 1, at 35–36 (questions 13 and 18—requiring disclosures of gifts or transfers not in the ordinary course of financial affairs made within two years). The Debtors did not schedule the funds as property that they held for another—presumably because Ms. Hartwell established the accounts for the minor children. The inference that I draw from the evidence is that the transferred funds remained available to the Debtors, but were intentionally deposited into accounts in the names of their children because of the pendency of the Bucci state court action. Avoiding disclosure of the transfer because of the timing of the bankruptcy filing, I find that the Debtors had continuing concealed interests in those funds that constitute assets that must have been disclosed in the Schedules and Amended Schedules and that the Debtors intentionally concealed their interest in those assets or did so with reckless indifference. Ms. Campbell's testimony regarding borrowing funds from her mother or the "children's accounts" in the past support the conclusion that the Debtors exercised dominion and control over funds deposited for their children and used those funds for personal expenses.

### iv. Uncashed Bank Checks Payable to Third Parties

On December 29, 2022, Ms. Campbell requested an "official check" from Hanscom in the amount of $7,800.00 made payable to Lawson & Weitzen, the Campbells' former attorneys. Ex. 15, at 341. On January 5, 2023, Ms. Campbell requested an official check from Hanscom in the amount of $5,000 made payable to Iovino Excavating, the Campbells' former contractor. *Id*. at 342. Neither of those bank checks has been cashed. *See* Affidavit of Prajita Bhattarai on Behalf of Hanscom Federal Credit Union ("Bhattarai Affidavit") [ECF No. 46], ¶¶ 2, 4, and Bhattarai Aff. Exs. 1–3.

Lawson & Weitzen provided an affidavit from its Finance Manager, attesting that it never received the $7,800.00 check and that the last payment it received from the Campbells was on or about July 27, 2022.  *See* Affidavit of Kieran Murray on Behalf of Lawson & Weitzen, LLP [ECF No. 44], ¶ 3.  Ms. Campbell testified that the Campbells owed several hundred thousand dollars to Lawson & Weitzen.  She testified that she did not know why the checks were uncashed and that she thought she mailed the Lawson & Weitzen check.

"Under Hanscom policy and operating procedures, an account holder can request the cancellation of an uncashed official check.  Upon cancellation, the funds would be returned to the account holder's account."  Bhattarai Aff., at ¶ 5.  Both checks would have been void before the Campbells filed their petition in August 2023.  *See, e.g.*, Ex. 15, at 320, 331 (Hanscom Official Checks Void after 180 days).  Simply by requesting cancellation, therefore, the Campbells could restore the full amount of the uncashed official checks, $12,800.00, to their bank account.

The timing of the official check requests by the Campbells coincides with the timeframe they testified that they started to contemplate filing for bankruptcy.  It also coincides with large, unaccounted for cash withdrawals made by the Campbells to be discussed below.  I do not credit Ms. Campbell's testimony regarding the checks.  The evidence, with reasonable inferences therefrom, demonstrates that the Campbells knowingly and fraudulently failed to disclose in the Schedules that they were in possession of the undelivered Lawson & Weitzen and Iovino Excavating checks or did so with reckless indifference and acted with intent to conceal the undelivered checks and the fact that the Campbells had control over the checks and could convert the checks to cash for themselves.

15

v. <u>Cash Withdrawals in the Year Preceding the Bankruptcy Filings</u>

The jury in the consolidated civil trials against the Campbells issued its verdict on September 30, 2022.[7] In the next several months and within a year of filing for bankruptcy protection, the Campbells withdrew more than $20,000.00 in cash from their Hanscom account. On October 7, 2022, Ms. Campbell made a cash withdrawal in the amount of $6,700.00. Ex. 15, at 48, 338. On November 29, 2022, Mr. Campbell made a cash withdrawal in the amount of $14,000.00. *Id.* at 53, 340. The transaction receipt indicates that Mr. Campbell requested $1,000.00 in twenties, $2,000.00 in fifties, and $11,000.00 in hundreds. *Id.* at 340. At trial, neither of Campbells could provide a credible explanation for why they made the substantial cash withdrawals or the ultimate disposition of the cash.

Ms. Campbell testified that she could not remember the purpose for withdrawing $6,700.00 in October 2022. Mr. Campbell speculated that the cash withdrawals could have been to make reimbursements to families of other soccer players or mortgage payments, but was confronted with earlier testimony that he could not remember how that cash was used. Ms. Campbell had testified that, in her role as one of her children's team's parent managers, she would use a Venmo account for soccer expenses. In fact, she provided testimony that, because the Venmo account was used for this purpose, she inadvertently failed to disclose the account in her name in the Schedules. Documentary evidence showed that during that time period the Campbells paid their Salem 5 mortgage from their Hanscom account. *Id.* at 48, 53, 57.

The Campbells' testimony relating to cash withdrawals was not credible and their "cash activity" is evidence of their desire to manage their resources in the face of a judgment and possible bankruptcy filing. This is consistent with my findings regarding the tax refund checks,

---

[7] *Bucci, et al. v. Campbell, et al.*, Middlesex Superior Court, Civil Action No. 1981CV1608, Dkt. No. 38.

the solar panel check, the payments to Ms. Hartwell, and the undelivered bank checks. The evidence is not sufficient for me to find that the Campbells were in possession of the cash and failed to disclose the cash in their Schedules, but based on the evidence and reasonable inferences therefrom, I do find that the Campbells have not adequately explained the loss or disposition of these assets.

      vi. Other Alleged False Statements and Concealment

I now return to the false statements admitted by the Campbells to have been made in their Schedules. *See* Joint Pre Trial Mem. (stipulated facts); LC Aff., ¶ 47; WC Aff., ¶ 20. The Campbells failed to disclose jewelry, pets, a Venmo account, and various home furnishings and equipment. The Campbells also misstated certain expenses, income, account balances, and liens. While certain of the statements were not material regarding pets and furnishings, statements regarding the Venmo account, income, expenses, and the amount of mortgage balances and liens were material. The Campbells testified that these misstatements were inadvertent. As noted above, when viewed alone, inadvertence might explain these misstatements. But, when viewed with a broader lens and my findings above, the evidence, with reasonable inferences therefrom, demonstrates that the Campbells knowingly and fraudulently failed to disclose or made misstatements regarding the Venmo account and their income, expenses, and liabilities—or did so with reckless indifference. There is no dispute that, as disclosed in the Schedules, the statements were false, and the Campbells have failed to introduce credible evidence that satisfactorily explains the false statements or omissions.

    c. *Rulings on 727 Counts*

Based on my findings above, I have determined that the Plaintiffs have met their burden to demonstrate that the Campbells should be denied a discharge because they (i) knowingly and

17

fraudulently made false statements under oath in connection with material facts and disclosures in this case, or made those statements with reckless indifference to the truth, (ii) failed to explain satisfactorily loss of assets or deficiency of assets to meet the debtor's liabilities, and (iii) concealed property (or engaged in continuing concealment) within one year of the petition date or concealed property of the estate. *See* 11 U.S.C. § 727(a)(2), 727(a)(4), and 727(a)(5). With respect to statements that I have found were material and false or made with reckless indifference to the truth, the Campbells have failed to proffer credible evidence that would excuse the false statements or omissions. *See In re Tully*, 818 F.2d at 110. I also find that, with an intent to hinder delay or defraud creditors or the trustee, the Campbells concealed their interest in the 2022 tax refund checks, the undelivered bank checks payable to Lawson & Weitzen and Iovino Excavating, the bank check payable to Tesla for the installation of solar panels, and funds transferred to Ms. Hartwell and their children. *See In re Drumm*, 524 B.R. at 440–42. Finally, the evidence demonstrates that the Campbells withdrew a material amount of cash and obtained the bank checks payable to Lawson & Weitzen and Iovino Excavating that, according to the Schedules, were no longer in their possession. The Campbells have not met their burden of providing a credible satisfactory explanation for the disposition of those assets. *See In re Aoki*, 323 B.R. at 816–17.

II. **THE DEBTORS' MOTION TO CONVERT THE CASE TO A CASE UNDER CHAPTER 13**

In *Marrama*, the Supreme Court held that a chapter 7 debtor who is found to have acted in bad faith does not have an absolute right to convert their case to a case under chapter 13 where there would be cause for reconversion of the case to a chapter 7 case. *Marrama II*, 549 U.S. at 374–75. Here, I must assess whether, under the totality of the circumstances, the Campbells acted in bad faith so as to constitute cause under § 1307(c), and in making that assessment, I

18

"may consider, inter alia, (i) the accuracy of the debtor's financial statements; (ii) any other attempts by the debtor to mislead the bankruptcy court or manipulate the bankruptcy process; (iii) the type of debt sought to be discharged; (iv) whether the debt is dischargeable in chapter 7; and (v) the debtor's motivation in seeking to convert to chapter 13." *Marrama v. Citizens Bank of Mass. (In re Marrama) (Marrama I)*, 430 F.3d 474 (1st Cir. 2005), *aff'd, Marrama II*, 549 U.S. 365 (2007) (citing *Sullivan v. Solimini (In re Sullivan)*, 326 B.R. 204, 212 (B.A.P. 1st Cir. 2005).

> [A] bankruptcy court is entitled to demand utmost good faith and honesty from debtors in the preparation of their schedules and statements of affairs. . . . "The successful functioning of the bankruptcy [code] hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *In re Tully*, 818 F.2d at 110. Thus, concealment of assets is a long-recognized ground for rejecting a motion to convert a case. *See, e.g.*, . . . *In re Porter*, 276 B.R. 32, 37–38 (Bankr. D. Mass. 2002) (denying debtor's motion to convert, due to failure to disclose transfer of assets within one year of filing bankruptcy petition).

*Marrama I*, 430 F.3d at 482 (internal citations omitted).

In determining the 727 Counts and denying the Debtors' discharge, I have found that the Debtors (i) knowingly and fraudulently made false statements under oath in connection with material facts and disclosures in this case, or made those statements with reckless indifference to the truth, (ii) failed to explain satisfactorily loss of assets or deficiency of assets to meet the debtor's liabilities, and (iii) concealed property (or engaged in continuing concealment) within one year of the petition date or concealed property of the estate. The Campbells filed inaccurate Schedules, and I have inferred from the credible evidence that they attempted to manipulate the bankruptcy process by concealing assets.[8] These findings demonstrate bad faith and "cause" under § 1307(c) that would mandate reconversion of this case.

---

[8] Furthermore, I infer from the evidence that part of the Campbells' motivation in seeking conversion of this case was to avoid a determination that they are not entitled to a discharge under § 727. While the Buccis had not filed their Adversary Proceeding at the time the Debtors filed the Motion, the Buccis had forecast their intention through extensions requested with respect to the deadline to object to discharge and several Fed. R. Bankr. P. 2004 examination requests and related activity to compel compliance with subpoenas issued in connection with those requests.

For those reasons, the Motion will be denied.

### III. CONCLUSION

For the reasons above, the Court will enter judgment in favor of the Plaintiffs on the 727 Counts and an order denying the Motion.[9]

Dated: September 29, 2025                    By the Court,

_____
Christopher J. Panos
United States Bankruptcy Judge

---

[9] As previously noted, the Court stayed determination of Count V of the complaint pending resolution of the 727 Counts and because judgment will enter in favor of the Plaintiffs on the 727 Counts, Count V is moot. Additionally, the remaining relief requested by the Debtors in their motion to dismiss the Adversary Proceeding or, in the alternative for a more definite statement regarding Count V [ECF No. 7] is denied and a separate order will enter with respect to that motion as a result of this decision.